UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                             :

SUZANNE LOUGHLIN, et al.                   :

                 Plaintiffs,       :

                                             :           20-cv-6357 (LJL)

      -v-                           :

                                             :        OPINION AND ORDER

GLENN GOORD,                      :

                               :

                 Defendant.       :

                                             :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_09/01/2021__

LEWIS J. LIMAN, United States District Judge:

       Defendant Glenn Goord moves, pursuant to Federal Rule of Civil Procedure 12(b)(2) and

12(b)(6), to dismiss the claim against him for lack of personal jurisdiction and failure to state a

claim. For the following reasons, the motion is granted, and the Amended Complaint is

dismissed, pursuant to Rule 12(b)(6), for failure to state a claim.

BACKGROUND

       Plaintiffs Suzanne Loughlin, Harry Rhulen, and James Satterfield (collectively

"Plaintiffs") bring claims for breach of fiduciary duty and libel against Glenn Goord

("Defendant"), a director of Rekor Systems, Inc. ("Rekor" or the "Company"), a Delaware

corporation. Dkt. No. 10 ("Amended Complaint" or "Am. Compl.") ¶ 1, 10, 70-74, 76-91.[1] In

inflammatory rhetoric, Plaintiffs allege that, as a director of Rekor, Goord participated in a

campaign of retaliation against the Plaintiffs, leading to his breach of fiduciary duty to Plaintiffs

and his commission of libel against them. *Id.* ¶¶ 40-42, 77-85. The retaliation campaign

allegedly began after Rhulen made a whistleblower complaint to the Rekor board concerning

---

[1] The following facts are drawn from the Amended Complaint and accepted as true for purposes
of this motion only.

Robert Berman who is Rekor's Executive Chairman, Chief Executive Officer, and largest and controlling shareholder.  *Id.* ¶¶ 1, 12-14, 38-41.

Goord is a "long-time friend and colleague of Berman" whom Berman recruited to join the Rekor board in 2017, *id.* ¶¶ 15-16, and who was elected to the Rekor board at an annual meeting held in New York City in 2019, *id.* ¶¶ 24-28.  Goord now serves as Chair of the Rekor Compensation Committee and as a member of the Rekor Audit Committee.  *Id.* ¶ 23.  Plaintiffs allege that Goord has maintained a summer residence in New York State for more than 40 years, *id.* ¶¶ 17-19, and that it is his "practice . . . to spend every Summer at his New York State residence," *id.* ¶ 19.  There is no dispute that Goord was personally served while he was at his residence in New York State.  *See* Dkt. No. 26, Transcript of August 13, 2021 Hearing ("Hr'g Tr."), at 4:2-3.

Plaintiffs' involvement with Rekor began in 2016 when Berman approached Plaintiffs about the possibility of Rekor acquiring the entities of which Plaintiffs were majority owners, Firestorm Solutions LLC and Firestorm Franchising LLC (together, "Firestorm").  Am. Compl. ¶¶ 31-32.  On January 25, 2017, Rekor acquired Firestorm, as memorialized in a Membership Interest Purchase Agreement ("Purchase Agreement") pursuant to which Firestorm became a wholly owned subsidiary of Rekor.  *Id.* ¶¶ 33-34.  Under the Purchase Agreement, each Plaintiff was compensated for his or her respective interests in Firestorm in four different ways: by a cash payment, by Rekor shares, by warrants for Rekor shares, and by promissory notes.  *Id.* ¶ 35.  Also pursuant to the Purchase Agreement, on January 25, 2017, each Plaintiff entered into an employment agreement with Rekor or a subsidiary of Rekor:  Rhulen was employed as President of Rekor; Loughlin was employed as General Counsel and Chief Administrative Officer of

Rekor; and Satterfield continued to serve as President and Chief Executive Officer of Firestorm. *Id*. ¶¶ 36-37.

Plaintiffs allege that retaliation began after Rhulen made an unspecified "whistleblower complaint to the [Rekor] Board concerning Berman," after which "Berman decided to punish [Rhulen] as well as [Loughlin and Satterfield] by a campaign of retaliation" because "Berman believed that they were aligned against him given their collective association at Firestorm and because [Loughlin and Rhulen] are siblings." *Id*. ¶¶ 38-39.  Plaintiffs allege that "Berman and the [Rekor] Board, including Goord . . . , decided to use Rekor as their agent" in retaliating against Plaintiffs "and used Rekor's corporate assets for Berman's personal agenda to effectuate" the retaliation.  *Id*. ¶ 40.  Plaintiffs allege that Goord "aided and abetted" Berman in his retaliation against Plaintiffs, that he "acquiesced to various aspects" of the retaliation, and that "[a]t minimum, Goord knew that Berman was engaging in [retaliation] for personal reasons and with improper motive yet he did not use his authority as a member of the [Rekor] Board to stop him." *Id*. ¶ 41.

Plaintiffs allege that the retaliation campaign encompassed several different incidents. For example, in 2018, Goord and the other members of the Rekor board approved the decision to remove Rhulen from his position of President of Rekor and appoint him instead as an Executive Vice President of Firestorm.  *Id*. ¶¶ 43-45.  Plaintiffs allege the decision was "not made for performance-based reasons, but for personal reasons."  *Id*. ¶ 44.

Rekor also did not pay Loughlin and Satterfield for services rendered and decided to close Firestorm.  Specifically, in December 2018, each of the Plaintiffs resigned from their respective positions with Rekor and Firestorm, but Loughlin and Satterfield subsequently entered into a consulting agreement with Firestorm whereby they could "continue to contribute to

Rekor's success without having to deal with the hostile work environment created by Berman." *Id*. ¶ 46-47.  After Loughlin and Satterfield rendered services under the consulting agreement in January and February 2019, however, Berman "directed Firestorm not to pay" certain invoices for those services, "motivated, in whole or in part, by Berman's animus toward the Plaintiffs" as part of his retaliation.  *Id*. ¶ 53; *see also id.* ¶¶ 46-52.  Around the same time, and "[s]ubsequent to December 2018," the Rekor board "decided to close Firestorm as a business," *id*. ¶ 54, and "in or about May 2019, Rekor terminated all franchise agreements between Firestorm and [its] franchisees," *id*. ¶ 55.

In July 2019, Satterfield attempted to exercise the warrants he possessed in Rekor, and Loughlin attempted to transfer her warrants.  *Id.* ¶¶ 56-57.  The same month, "Berman, in consultation with Goord and others, decided that Rekor would not honor" those attempts, also out of animus and in retaliation.  *Id*. ¶ 58.  Goord "supported Berman's decision" not to honor the warrants, and "knew or should have known that there was no legitimate good faith basis to refuse to honor the Warrants and that the decision to do so was made in bad faith."  *Id*. ¶ 59.  In August 2020, each of the Plaintiffs attempted to exercise their warrants in Rekor, *id.* ¶ 61, but "Rekor also failed to honor" those attempts, *id*. ¶ 62.

On August 19, 2019, Rekor commenced an action against Plaintiffs ("Rekor Action"), which has been consolidated with this case.  *Id*. ¶ 63; *Rekor Sys., Inc. v. Loughlin*, No. 19-cv-7767 (S.D.N.Y. Aug. 19, 2019).  In the Rekor Action, Rekor brings claims against the Plaintiffs in this action, alleging, among other things, that the Purchase Agreement was fraudulently induced by the Plaintiffs who allegedly made misrepresentations and omissions concerning Firestorm's franchise business and prospects.  *See Rekor Sys., Inc. v. Loughlin*, 2020 WL 6898271, at *2 (S.D.N.Y. Nov. 23, 2020).  In the Rekor Action, Rekor seeks rescission of the

Purchase Agreement which would entail rescission of Rhulen, Satterfield, and Loughlin's warrants. *See id*., at *3; Am. Compl. ¶¶ 67-68. Among other relief requested in the Rekor Action is a declaration that the warrants are void. *Rekor Sys.*, No. 19-cv-7767, Dkt. No. 1, Complaint, ¶ 181; *id.*, Dkt. No. 64, Second Amended Complaint, ¶ 202.

In their answer in the Rekor Action, Rhulen, Satterfield, and Loughlin assert twenty counterclaims alleging that (1) Rekor breached the employment agreement with Rhulen by demoting him in retaliation for his whistleblower complaint about Berman; (2) Rekor breached the warrants by stating it was Rekor's position that the Purchase Agreement and transactions consummated thereunder were subject to recission and by not honoring Loughlin and Satterfield's attempts to exercise or transfer the warrants; (3) Rekor anticipatorily breached the warrants issued to Rhulen; (4) Rekor's directors breached fiduciary duties owed to Rhulen, Satterfield, and Loughlin as shareholders and warrant holders by not honoring the attempts to exercise the warrants; (5) Rekor anticipatorily breached the promissory notes; and (6) Rekor engaged in libel. *Id.*, Dkt. No. 71, Answer, ¶¶ 343-418. They allege that the Rekor board, "including Goord, approved the commencement" of the Rekor Action at a 2019 Rekor board meeting, Am. Compl. ¶ 64, and that the action was commenced "in bad faith and improper motive" in furtherance of Berman's retaliation, *id.* ¶ 65.

Though the Amended Complaint describes several incidents allegedly related to the overall retaliation campaign against them, Plaintiffs at oral argument narrowed their claim of breach of fiduciary duty to a single decision—the decision not to honor Plaintiffs' warrants. *See* Hr'g Tr., at 29:17-30:2. Plaintiffs allege that, as a member of the board, Goord owed fiduciary duties to them "as a result of their status as shareholders and warrant holders of Rekor." Am. Compl. ¶ 70. Goord's actions "improperly favored the interests of Rekor Board members

Berman, [James] McCarthy, and [Richard] Nathan, the controlling shareholders, by preventing the active dilution of their ownership percentages by Plaintiffs' exercise of their Warrants." *Id.* ¶ 71.  Plaintiffs allege that, by these actions, Goord "acted in bad faith and with an improper motive and has breached his fiduciary duties to the Plaintiffs by using Rekor as the instrument of Berman's desire to enact revenge for [Rhulen's whistleblower complaint]." *Id*. ¶ 72.

Plaintiffs also bring a claim for libel in connection with an August 14, 2019 Form 10-Q (the "Form 10-Q" or "10-Q") filed with the Securities and Exchange Commission ("SEC") and publicly available on Rekor's website. *Id*. ¶¶ 76, 86.  Plaintiffs allege that Goord, as a member of the Rekor board, "reviewed and approved" the Form 10-Q in question at a 2019 board meeting held in New York City. *Id.* ¶ 78.  In the section on "Recent Developments," the 10-Q contained the following statement:

> On June 25, 2019, the [*sic*] we sent a letter to three former executives of the Company and Firestorm (the Firestorm Principals). The letter described the Company's position that, because the Firestorm Principals fraudulently induced the execution of the Membership Interest Purchase Agreement pursuant to which Firestorm was acquired by the Company, the entire Membership Interest Purchase Agreement and the transactions contemplated thereby, including the issuance of the warrants, are subject to rescission.

Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 33 (Aug. 14, 2019).[2]  An almost identical statement was contained within "Note 13 – Commitments and Contingencies." *Id.* at 26. Plaintiffs allege that "Firestorm Principals" in the above statement referred to them, that the statement that Plaintiffs had "fraudulently induced the execution of the Membership Interest Purchase Agreement" is false and was made with actual malice in furtherance of the retaliation

---

[2] The Court may take judicial notice of Rekor's 10-Q on a motion to dismiss as it is a "public disclosure document[] required by law to be filed, and actually filed, with the SEC." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

campaign against them, and that it "disparages the Plaintiffs in their business or profession and is defamatory *per se*." *Id.* ¶¶ 82-83.

## PROCEDURAL HISTORY

After Plaintiffs initiated this action in New York State court in Sullivan County, Defendant removed the suit to this Court based on diversity jurisdiction and moved to dismiss. Dkt. Nos. 1, 3, 6.  Plaintiffs then filed an Amended Complaint, Dkt. No. 10, and Defendant again moved to dismiss for lack of personal jurisdiction and failure to state a claim under Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6).  Dkt. No. 11.  After briefing was fully submitted, the Court held oral argument on August 13, 2021.  Dkt. Nos. 25-26.

## LEGAL STANDARD

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At a pleading stage, a plaintiff need make only a prima facie showing by its pleadings and affidavits that jurisdiction exists, and such a showing may be established solely by allegations. *See id.* at 84-85.

This prima facie showing "must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id*. at 85 (quoting *Ball*, 902 F.2d at 197).  While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id*., the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist*

*Attacks on Sept. 11, 2011*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks and citations omitted).  When a plaintiff fails to make the requisite showing of jurisdiction over a defendant, the appropriate remedy is dismissal of all claims against that defendant.  *See TAGC Mgt., LLC v. Lehman*, 2011 WL 3796350, at *3 (S.D.N.Y. Aug. 24, 2011).

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely

to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." (internal quotation marks omitted)).

## DISCUSSION

### A.     Personal Jurisdiction

The parties do not dispute that service of process was personally effected on Goord while he was within the State of New York.  That is sufficient to establish general personal jurisdiction.

"To determine whether the exercise of personal jurisdiction is proper in a diversity case, the Court must conduct a two-part inquiry: first, the Court looks at whether there is a basis for personal jurisdiction under the laws of the forum state, and second, the Court must examine whether the exercise of personal jurisdiction comports with constitutional due process."  *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *6 (S.D.N.Y. Mar. 10, 2021). "Under New York Law, CPLR § 301 provides courts with personal jurisdiction over individuals who are properly served within the state."  *Mohamad v. Rajoub*, 2018 WL 1737219, at *5 (S.D.N.Y. Mar. 12, 2018); *see* N.Y. C.P.L.R. § 301 ("A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."); *id.* at C:301:2 *Presence: In General, Individuals* ("Service of process on the defendant while she is present in New York is a time-honored basis for the exercise of in personam jurisdiction.").

Plaintiffs predicate their assertion of personal jurisdiction on "tag" jurisdiction—i.e., jurisdiction flowing from personal service on an individual within the state.  In *Burnham v. Superior Court of California*, 495 U.S. 604 (1990), a plurality of the Supreme Court held that service of process on an individual who was only transiently in California satisfied the due process clause of the Fourteenth Amendment.  The petitioner in *Burnham* traveled to California only on "a few short visits . . . for the purposes of conducting business and visiting his children" and was served with process while in San Francisco for the weekend to visit his child.  *Id.* at 608.

The plurality stated: "Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State. . . . [A]nd that once having acquired jurisdiction over such a person by properly serving him with process, the State could retain jurisdiction to enter judgment against him, no matter how fleeting his visit." *Id.* at 610-11.  Thus, the *Burnham* plurality held that "jurisdiction based on physical presence alone constitutes due process." *Id.* at 619.

Justice Brennan wrote an opinion concurring in the judgment to form the majority.  His opinion was joined by Justices Marshall, Blackmun, and O'Connor.  Without subscribing to the broad proposition that "a jurisdictional rule that 'has been immemorially the actual law of the land,' automatically comport[ed] with due process," *id.* at 629 (quoting *id.* at 619), he stated that "the Due Process Clause of the Fourteenth Amendment generally permits a state court to exercise jurisdiction over a defendant if he is served with process while voluntarily present in the forum State," *id.* at 628-29, and that "as a rule the exercise of personal jurisdiction over a defendant based on his voluntary presence in the forum will satisfy the requirements of due process," *id.* at 639.[3]

The Second Circuit has read *Burnham* to hold that "personal service of a summons and complaint upon an individual physically present within a judicial district of the United States . . . comports with the requirements of due process for the assertion of personal jurisdiction." *Kadic v. Karadzic*, 70 F.3d 232, 247 (2d Cir.1995) (citing *Burnham*, 495 U.S. 604); *see also In re*

---

[3] Justice Brennan allowed that "there may be cases in which a defendant's involuntary or unknowing presence in a State does not support the exercise of personal jurisdiction over him" and stated that "[t]he facts of the instant case do not require us to determine the outer limits of the transient jurisdiction rule." *Id.* at 637 n.11.  The remaining member of the Court, Justice Stevens, simply stated that "the historical evidence and consensus identified by Justice Scalia, the considerations of fairness identified by Justice Brennan, and the common sense displayed by Justice White, all combine to demonstrate that this is, indeed, a very easy case." *Id.* at 640.

*Edelman*, 295 F.3d 171, 179 (2d Cir. 2002) ("In [*Burnham*], the Supreme Court authorized the exercise of personal jurisdiction based on nothing more than physical presence. . . . this so-called tag jurisdiction is consistent with due process . . . ." (citation omitted)).

Defendant argues that *Daimler AG v. Bauman*, 571 U.S. 117 (2014), restricts *Burnham* and demands more than that an individual is "tagged" in a state to establish personal jurisdiction comporting with constitutional due process. In *Daimler*, the Court held that a corporation could be sued only in the States where it is "at home"—its "place of incorporation and principal place of business," *id.* at 137—and that the due process clause did not permit "the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business," *id.* at 138 (internal quotation marks omitted). In concurrence, Justice Sotomayor critiqued the majority's reasoning as creating an:

> incongruous result that an individual defendant whose only contact with a forum State is a one-time visit will be subject to general jurisdiction if served with process during that visit, *Burnham v. Superior Court of Cal., County of Marin*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990), but a large corporation that owns property, employs workers, and does billions of dollars' worth of business in the State will not be, simply because the corporation has similar contacts elsewhere (though the visiting individual surely does as well).

*Id.* at 158 (Sotomayor, J., concurring).

Defendant argues that the result in *Daimler* undercuts the reasoning of the *Burnham* plurality, making it constitutionally intolerable for an individual to be subject to "tag" jurisdiction. If a corporation cannot be subject to jurisdiction based on its continuous and systematic course of business in a state, an individual should not be subject to jurisdiction based on his transitory presence in the state. Defendant also urges that the Court apply the more narrow reasoning of Justice Brennan, which—it presumes—would make it unconstitutional for personal jurisdiction to be exercised here.

There are many flaws in Defendant's argument.[4]  First, as a technical matter, the Court assumed in *Daimler* that the defendant corporation was foreign and was never present in the State.  The Court there addressed a very different question than that presented here where Goord indisputably *was* in New York when he was served.  "*Daimler* . . . answered 'the question "whether it violates due process for a court to exercise general personal jurisdiction over *a foreign corporation* based solely on the fact that an indirect corporate subsidiary performs services on behalf of the defendant in the forum State."'"  *Rajoub*, 2018 WL 1737219, at *6 (quoting *Daimler*, 571 U.S. at 147 (Sotomayor, J. concurring)).  Thus, the decision on its face does not call into question the separate *Burnham* holding regarding the exercise of jurisdiction over a defendant who is served while present in the forum state.

Indeed, the very quote highlighted by Defendant demonstrates the point and undermines Defendant's argument.  Justice Sotomayor assumed that the majority did not intend to disturb the rule permitting the exercise of jurisdiction based on an individual's transient presence in the forum state.  *See id.* at *7 ("Justice Sotomayor explicitly states [in *Daimler*] that *Burnham* is still good law and is distinct from the Court's holding in *Daimler*.").  Her point was that the *Daimler* holding created a discrepancy between the law of personal jurisdiction as applied to corporations and that applied to individuals.  The point would have had no force had she believed or assumed that tag jurisdiction was no longer good law.  In that case, there would have been no discrepancy.  Tellingly, the *Daimler* majority did not disabuse Justice Sotomayor of her notion.

---

[4] The only other court in this District that appears to have addressed the question has rejected the argument Defendant here advances.  *See Rajoub*, 2018 WL 1737219, at *6 ("Defendant argues that *Daimler* restricts *Burnham*.  It does not." (citation omitted)); *cf. In re Petrobras Sec. Litig.*, 393 F. Supp. 3d 376, 382 n.5 (S.D.N.Y. 2019) ("The *Edelman* Court's reasoning relies on the idea of 'tag jurisdiction' . . . . But after *Daimler*, this view of personal jurisdiction seems to apply only to individuals, rather than corporations." (citing *In re Edelman*, 295 F.3d at 179)).  This Court agrees with Judge Preska's reasoning and holding.

Second, both before and after *Daimler* was decided, the Second Circuit has stated its

understanding that *Burnham* held that, as a categorical matter, tag jurisdiction was constitutional.

*See Kadic*, 70 F.3d at 247 (upholding assertion of tag jurisdiction); *In re del Valle Ruiz*, 939 F.3d

520, 527 (2d Cir. 2019) (noting that "tag" jurisdiction "comport[s] with due process" in the

course of analyzing the jurisdictional reach of 28 U.S.C. § 1782 and citing *In re Edelman*, 295

F.3d at 179); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1038

(2021) (Gorsuch, J., concurring) ("[I]ndividual defendants remain subject to the old 'tag' rule,

allowing them to be sued on any claim anywhere they can be found." (citing *Burnham*, 495 U.S.

at 610-11)).  Defendant argues that the Second Circuit's post-*Daimler* statements were not

critical to any decisions and thus do not constitute holdings.  But even if the only holding by the

Circuit were its pre-*Daimler* decision in *Kadic*, this Court would not be free to disregard that

holding even if it believed as an original matter that tag jurisdiction was not constitutional.  *See*

*Grytsyk v. Morales*, 2021 WL 1105368, at *8 (S.D.N.Y. Mar. 22, 2021) ("It is well established

that a district court must follow a precedential opinion of the Second Circuit 'unless and until it

is overruled . . . by the Second Circuit itself or unless a subsequent decision of the Supreme

Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'"

(quoting *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd,* 854 F.3d 197

(2d Cir. 2017))).

Finally, even if Defendant was right that Justice Brenan's concurrence provided the

operative rule of law, that would not help him in this case.  Goord's presence in New York State

was not involuntary or unknowing when he was served at his secondary residence in the State.

*See Burnham*, 495 U.S. at 637 n.11.  He had far more contacts with the State than Burnham did

with California.  Goord did not just occasionally visit the State to see his children or to conduct

business; he retained a second home in the State allegedly for more than forty years and allegedly spent every summer at this secondary residence. *See* Am. Compl. ¶¶ 17, 19. If every member of the Court in *Burnham* thought the petitioner there could be sued because he was served with process while he was only in the State on a transitory basis visiting his child, so too Goord can be sued here based on his presence in the State when he was served. Having addressed jurisdiction,[5] the Court next turns to the merits.

### B.    Breach of Fiduciary Duty

Plaintiffs allege that Goord breached his fiduciary duties by supporting the decision not to honor Plaintiffs' warrants and in doing so favored the interests of Rekor's controlling shareholders and furthered a retaliation campaign against Plaintiffs. Plaintiffs' allegations fail to state a claim for relief. To the extent Plaintiffs were injured in their capacity as warrant holders—because Rekor did not convert their warrants into shares—that injury would not be compensated for through a breach of fiduciary duty claim. Warrant holders are not owed fiduciary duties; Plaintiffs' claim lies in the law of breach of contract or not at all. To the extent Plaintiffs purport to assert a claim as shareholders, the claim is defective for a different reason. They do not assert that they have been injured as shareholders and, in any event, they could not overcome the business judgment rule or assert a direct claim.

Plaintiffs' principal claim is that they experienced "direct injury . . . when the Warrants were not honored," Dkt. No. 16, Opp., at 14. The decision by Rekor not to honor the warrants deprived Plaintiffs of their opportunity to receive Rekor shares in exchange. The loss of the opportunity to exercise the warrants, however, was experienced by Plaintiffs in their capacities as warrant holders of Rekor. It was not loss experienced as shareholders of Rekor. The fact that

---

[5] In light of the Court's conclusion that "tag" jurisdiction exists, it need not reach the alternative argument that Plaintiffs properly assert specific jurisdiction.

Plaintiffs happened to be shareholders is irrelevant.  Plaintiffs would have suffered the identical

loss were they not shareholders.

Thus, Plaintiffs cannot assert a claim for breach of fiduciary duty for the loss of the value

of their warrants.  They were not owed fiduciary duties in their capacities as warrant holders.

Warrant holders are not owed fiduciary duties; they are owed only contractual duties.  A claim

for breach of fiduciary duty "must be based on an actual, existing fiduciary relationship between

the plaintiff and the defendants at the time of the alleged breach."  *Omnicare, Inc. v. NCS*

*Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. 2002), *rev'd on other grounds*, 818 A.2d 914

(Del. 2003).  "The holders of debentures, bonds, and warrants are not stockholders and are not

owed fiduciary duties," *In re Nine Sys. Corp. S'holders Litig.*, 2013 WL 771897, at *7 (Del. Ch.

Feb. 28, 2013), and therefore "lack standing" to bring a claim for breach of fiduciary duty, *id.*;

*see also Simons v. Cogan*, 549 A.2d 300, 304 (Del. 1988) ("[A] mere expectancy interest does

not create a fiduciary relationship."); *Feldman v. Cutaia*, 2006 WL 920420, at *6 n.37 (Del. Ch.

Apr. 5, 2006) ("The Delaware Supreme Court has consistently held that directors do not owe

fiduciary duties to future stockholders.").[6]  Indeed, the warrants themselves explicitly provide:

"Nothing contained herein shall entitled the Registered Holder to any rights as a stockholder of

the Company or to be deemed the holder of any securities that may at any time be issuable on the

exercise of the rights hereunder for any purpose . . . ."  Dkt. No. 17-5, ¶ 11; *see also* Dkt. No.

---

[6] Delaware law applies to Plaintiffs' breach of fiduciary duty claim, as Rekor is a Delaware corporation and "New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims."  *Kravitz v. Binda*, 2020 WL 927534, at *13 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Kravitz as Tr. of Creditor Tr. of Advance Watch Co., Ltd. v. Binda*, 2020 WL 917212 (S.D.N.Y. Feb. 26, 2020) (quoting *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011)); *see Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980) (noting that under New York's choice-of-law rules, "the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation").

17-6, ¶ 11; Dkt. No. 17-7, ¶ 11; Dkt. No. 17-8, ¶ 11; Dkt. No. 17-9, ¶ 11; Dkt. No. 17-10, ¶ 11.

Plaintiffs were not owed any greater fiduciary duties with respect to the warrants because they

happened to be shareholders than the owner of any other contractual right against Rekor would

be owed fiduciary duties if they happened to buy a share of stock in the public markets.  In either

case, their only remedy would be contractual.[7]

Plaintiffs make a passing argument that they are also owed fiduciary duties in their status

as shareholders.  *See* Dkt. No. 16, Opp., at 14.  But they do not assert injury, much less direct

injury, suffered in their capacity as shareholders.  In that capacity, they could only have gained

by virtue of Rekor's determination not to honor the warrants.  The effect of a decision not to

honor the warrants would be to decrease the number of Rekor shares that otherwise would have

been outstanding.  All else being equal, it increased the effective ownership of each of the

existing shareholders.  It had the same effect on Plaintiffs in their capacities as shareholders as it

had on each of Goord, Berman, and the other directors, all of whom—Plaintiffs allege—

benefitted in their capacities as shareholders from the decision not to honor the warrants.

Finally, to the extent that Plaintiffs' complaint could be understood to allege some other

kind of injury experienced by them as shareholders—viz, incurring the wrath of the Plaintiffs in

their capacities as warrant holders or having to defend against the counterclaims in the Rekor

lawsuit alleging breach of contract—that claim would clearly be derivative and, in any event,

would be protected by the business judgment rule.  A decision that affects each shareholder

equally in their capacities as shareholders is derivative and thus does not give rise to a direct

---

[7] Plaintiffs retain their contract rights against Rekor under the warrants and are entitled to whatever protection they bargained for with Rekor.  *See Airlines v. American Gen.*, 575 A.2d 1160, 1168 (Del.1990) (explaining that warrant holders are protected by contractual rights).  That is the counterclaim they are asserting in the action brought by Rekor.

claim; it can be prosecuted by an individual shareholder only in the name of the corporation and only after making demand (unless it is excused) and giving the board the opportunity to assume control of the lawsuit. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004). Moreover, as Plaintiffs do not allege any facts that create "a reasonable doubt . . . that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment," Goord's actions would be shielded by the business judgment rule. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984); *see In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005) ("Disinterested 'means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.' 'Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'" (quoting *Aronson*, 473 A.2d at 812, 816)), *aff'd,* 906 A.2d 766 (Del. 2006); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004) (rejecting claim that "the professional and social relationships that naturally develop among members of a board impede independent decisionmaking" and finding insufficient to rebut the presumption of independence that some directors "moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friend'").

### C.   Libel

Plaintiffs also bring a claim for libel, alleging that Goord, as part of the Rekor board, "reviewed and approved" the SEC 10-Q filing, which contained a statement that allegedly defamed Plaintiffs. Am. Compl. ¶ 77. In the section on "Recent Developments" and note on "Commitments and Contingencies," the Form 10-Q reported on the fact that within the quarter

just ended (specifically on June 30, 2019), Rekor had sent a letter to persons whom the 10-Q described as "three former executives of the Company and Firestorm (the Firestorm Principals)" and then described the content of the letter: "The letter described the Company's position that because the Firestorm Principals fraudulently induced the execution of the Membership Interest Purchase Agreement pursuant to which Firestorm was acquired by the Company, the entire Membership Interest Purchase Agreement and the transactions contemplated thereby, including the issuance of the warrants, are subject to rescission." Form 10-Q, at 26, 33; Am. Compl. ¶ 79.

Plaintiffs do not contend that the statement that Rekor had sent a letter to three former executives of the Company and Firestorm stating the Company's position that the issuance of the warrants was subject to rescission alone is actionable as libel. *See* Hr'g Tr. 21:8-11, 22:20-25. That statement was plainly true and of tremendous interest to every shareholder, each of whose interests in Rekor would otherwise have been diluted by exercise of the warrants. A company may take the position that warrants, or some other contractual right, were improperly obtained and thus may not be exercised, free from the risk that in doing so they will subject themselves to a suit not only for breach of contract but also for defamation. Rather, Plaintiffs allege that the portion of the 10-Q statement that stated the basis for the Company's position—that the Membership Interest Purchase Agreement had been fraudulently induced—so shareholders would be able to understand and therefore be able to assess the strength of the Company's position was itself defamatory. They allege that the statement "disparaged them in their business and profession" and therefore was defamatory per se, that it was false and made with actual malice to further what Plaintiffs claim was "the Retaliation Campaign," and that it was made "with malicious intent, in order to smear the Plaintiffs and to pressure Plaintiffs to acquiesce to

Rekor's and the Board's determination to repudiate their obligations to Plaintiffs pursuant to the Warrants and the Notes, and to further the Retaliation Campaign."  Am. Compl. ¶¶ 83-85.

"Under New York law, to state a claim for defamation, a plaintiff must allege '(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.'"  *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 169-70 (S.D.N.Y. 2021) (alteration in original) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) ("Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander."), *aff'd,* 29 F. App'x 676 (2d Cir. 2002).  "Although a jury determines if a plaintiff has been defamed, '[w]hether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance.'"  *Ganske v. Mensch*, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020) (alterations in original) (quoting *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir. 2000)).

There is no dispute on this motion that the 10-Q statement is "of and concerning" Plaintiffs.  It is not necessary that Plaintiffs be identified by name; it is sufficient that a plaintiff "plead and prove that the statement referred to them and that a person hearing or reading the statement reasonably could have interpreted it as such."  *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 65 N.E.3d 35, 37 (N.Y. 2016).  Plaintiffs allege that the term Firestorm Principals used in the Form 10-Q statement previously was defined by Rekor in its Form 10-K to refer to all of them collectively.  Am. Compl. ¶ 82; *see also* Rekor Sys., Inc., Annual Report (Form 10-K), at 64 (Apr. 11, 2019) (describing how the company "entered into employment agreements with Harry Rhulen, James Satterfield and Suzanne Loughlin (the 'Firestorm Principals')").  As a

result, it is reasonable that a person reading the 10-Q statement could have interpreted it to refer to Plaintiffs. *Cf.* 17 C.F.R. § 210.10-01(a)(5) ("Registrants may presume that users of the interim financial information have read or have access to the audited financial statements for the preceding fiscal year and that the adequacy of additional disclosure needed for a fair presentation may be determined in that context.").

Defendant argues that the 10-Q statement cannot give rise to an action in libel under New York state law first because it is a statement of opinion, and second and in the alternative, because the statement is otherwise privileged within the context of Rekor's litigation against Plaintiffs and the context of the mandatory SEC filing.

"Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false, . . . only statements alleging facts can properly be the subject of a defamation action." *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014) (quoting *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993)) (internal quotation marks omitted). Thus, a statement of pure opinion is not actionable under New York law "because '[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.'" *Id*. (alteration in original) (quoting *Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008)). Specifically, "[i]n discerning whether a statement is actionable under New York law, the Court considers a non-exclusive list of factors that includes: '(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97,

110 (2d Cir. 2017) (quoting *Gross*, 623 N.E.2d at 1167).  "The third factor 'lends both depth and difficulty to the analysis,' and requires that the court consider the content of the communication as a whole, its tone and apparent purpose." *Davis*, 22 N.E.3d at 1005 (quoting *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995)).  "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff.'" *Brian*, 660 N.E.2d at 1130 (quoting *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991)).

Although the question is close, the Court concludes that the Form 10-Q statement is not protected opinion.  First, the Form 10-Q statement is made in specific language.  The report does not just use the term "fraud" loosely and in uncertain terms.  It describes a specific document that was induced by fraud and ascribes legal consequences to it—the Membership Interest Purchase Agreement and the warrants are subject to rescission.  It thus has a definite and concrete meaning.

Second, the statement that Plaintiffs "fraudulently induced the execution of the Membership Interest Purchase Agreement" is capable of being proven true or false.  That a person has engaged in the acts of fraud that would permit the rescission of warrants under a warrant agreement is not merely in the eye of the beholder or an opinion of a single individual. This statement is not akin to "[l]oose, figurative or hyperbolic statements," *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (N.Y. App. Div. 1999), "'rhetorical hyperbole' or 'vigorous epithet[s],'" *Gross*, 623 N.E.2d at 1169, or "'imaginative expression' that is typically understood as a statement of opinion," *Ganske*, 480 F. Supp. 3d at 553.  Rather, the statement implicitly

"convey[s] 'facts' that are capable of being proven true or false," that is, that the three individuals engaged in conduct with respect to the Membership Interest Purchase Agreement that would rise to the level of fraudulent inducement and that would justify the drastic remedy of rescission. *Gross*, 623 N.E.2d at 1169.  In fact, that is what Plaintiffs' contract claim in the Rekor Action is about.  The first and second factors are satisfied and indicate that the statement is an actionable statement of fact.

The third factor—the immediate and larger context in which the allegedly defamatory statement was published—is closer.  The context of the statement—in the sections of a Form 10-Q in which the reporting entity is required to report on "Recent Developments" and "Commitments and Contingencies"—and the language stating that it was the Company's "position" that the Membership Interest Purchase Agreement is subject to rescission are such that the statement could be understood to convey information not regarding Plaintiffs but rather regarding a historical position of the Company that was of relevance to investors regardless of its truth or falsity.  Plaintiffs do not suggest, for example, that a company could not report the fact of a material accusation by a third party against one of its senior officers that was independently relevant to share value without being subject to a defamation lawsuit.  To some extent, the Form 10-Q statement is of similar quality.  It could be read as a report of a historical fact—that the Company had taken this position and that it created a risk or contingency that the warrants might be cancelled but that it was only one position and that there would be others and that it was not necessarily true or accurate.

In the end, however, this factor too favors Plaintiffs at least at the initial pleading stage.  The publisher of the Form 10-Q statement is identical to the maker of the underlying statement— that the three Plaintiffs engaged in conduct that would constitute fraudulent inducement.  The

context would suggest "to the reader that [the Company] spoke with authority, and that [its] statements were based on facts . . . [as it was] well placed to have information about [the subject matter]." *Davis*, 22 N.E.3d at 1007.  The Form 10-Q statement, in context and as drafted, thus carries with it the implied representation that not only did the Company take the position that the three individuals engaged in fraud but that there were facts supporting that claim.  It is not a defense that the allegedly defamatory language is phrased as the Company's "position" or that the statement is framed as a report on a letter that the Company had sent.  "[A] statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification." *Elias*, 872 F.3d at 111 (citing *Gross*, 623 N.E.2d at 1169); *Gross*, 623 N.E.2d at 1169 ("[I]f the statement 'John is a thief' is actionable when considered in its applicable context, the statement '*I believe* John is a thief' would be equally actionable when placed in precisely the same context.").[8]  Moreover, the statement that Plaintiffs engaged in fraudulent inducement without stating anything more "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it" and thus "is a 'mixed opinion' and is actionable." *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552-53 (N.Y. 1986).  "'[T]he implication that the speaker knows certain facts, unknown to [the] audience, which support [the speaker's] opinion and are detrimental to the person' being discussed," and is "based on 'what the average person hearing or reading the communication would take it to mean'" is "[w]hat differentiates an actionable mixed opinion from a privileged, pure opinion." *Davis*, 22 N.E.3d at 1004 (alterations in original) (quoting *Steinhilber*, 501 N.E.2d at 553).  The proposition is an

---

[8] Nor does the fact that the 10-Q statement repeats an allegedly defamatory statement that previously was made in another context mean that it is not independently actionable.  *See Geraci v. Probst*, 938 N.E.2d 917, 921 (N.Y. 2010) ("[E]ach person who repeats the defamatory statement is responsible for the resulting damages.").

important one—by forcing the revelation of the underlying facts upon which a conclusion such

as that the defendant engaged in fraud is formed, the law both gives readers the opportunity to

make their own judgment and also gives the subject of the statement the opportunity to challenge

the underlying facts and to sue on the grounds that they are defamatory if the legal requisites of

that claim are satisfied.  *See id.* ("This requirement that the facts upon which the opinion is based

are known 'ensure[s] that the reader has the opportunity to assess the basis upon which

the opinion was reached in order to draw [the reader's] own conclusions concerning its

validity.'" (quoting *Silsdorf v. Levine*, 449 N.E.2d 716, 719 (N.Y. 1983)).

The Form 10-Q statement, made by the same person who made the underlying claim,

plainly implies that it is made with authority and its author is in possession of facts that would

support the accusation of fraudulent inducement.  It conveys that there are facts, not disclosed to

the reader, that would establish that the Plaintiffs made misrepresentations to Rekor and that

those misrepresentations were both intentional and material.  It thus carries with it a defamatory

implied assertion of fact, and, in context, would not be understood as just a label or conclusion.[9]

That understanding is bolstered by the "common expectation" that a statement in a SEC report

"will serve as a vehicle for the rigorous and comprehensive presentation of factual matter [and

not] as one principally for the expression of individual opinion."  *Immuno* AG, 567 N.E.2d. at

1280; *see Steinhilber*, 501 N.E.2d at 556 ("[E]ven apparent statements of fact may assume the

character of statements of opinion, and thus be privileged, when made in public debate, heated

labor dispute, or other circumstances in which an audience may anticipate the use of epithets,

---

[9] Here, there was no location where an investor could locate the basis for the Company's
position.  The statement thus is distinguishable from those not infrequently made in SEC filings
where a company reports on outstanding litigation and provides a citation to the name and
location of a case so that the investor can view the underlying pleadings for herself.

fiery rhetoric or hyperbole." (internal quotation marks omitted)); *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 937-38 (N.Y. 1992) ("Reasonable listeners come to a public hearing with expectations that the speaker is airing a layperson's opinion. Nothing about the circumstances of this hearing . . . would lead reasonable persons to conclude that they were witnessing a presentation of fact.").  If a statement that three former officers engaged in a fraud against the company can never support a defamation claim, what about a statement that a current or former officer has committed some heinous personal crime or that a competitor has engaged in unlawful conduct to harm the national interest?  Defendant's legal position admits of no ready limiting principle.  An SEC filing would become a protected zone in which all kinds of defamatory accusations could be flung without support and with impunity subject to regulation perhaps only by the federal securities laws and the Securities and Exchange Commission. *Cf. Brian*, 660 N.E.2d at 1130 ("[W]e have never suggested that an editorial page or a newspaper column confers a license to make false factual accusations and thereby unjustly destroy individuals' reputations.").

Defendant argues, alternatively, that even if the 10-Q statement is not protected as opinion, it is privileged, and that Plaintiffs have not alleged facts to overcome the privilege. "New York '[p]ublic policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action.'" *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011) (alteration in original) (quoting *Toker v. Pollak,* 376 N.E.2d 163, 166 (N.Y. 1978)).  "Because the perceived social benefit in encouraging free speech or the discharge of governmental responsibility sometimes outweighs the individual's underlying right to a good reputation, the individual's right may have to yield to a privilege granted the speaker

barring recovery of damages for the defamatory statements." *Park Knoll Assocs. v. Schmidt*, 451 N.E.2d 182, 184 (N.Y. 1983).

The facts here do not fit squarely into any privilege previously specifically recognized by the New York Court of Appeals.  In the absence of a settled interpretation of state law, the Court's role is to "'predic[t] how the state's highest court would resolve the uncertainty or ambiguity'" "guided by decisions of the state's lower courts, decisions on the same issue in other jurisdictions, and 'other sources the state's highest court might rely upon in deciding the question.'" *Tantaros v. Fox News Network, LLC*, No. 20-3413-cv, --- F.4th ----, 2021 WL 3821839, at *3 (2d Cir. Aug. 27, 2021) (first quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); and then quoting *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005)); *see also Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 383, 390 (S.D.N.Y. 2018).

The 10-Q statement is not protected by a litigation privilege.  "[I]t is well-settled that statements made in the course of litigation are entitled to absolute privilege." *Front, Inc. v. Khalil*, 28 N.E.3d 15, 18 (N.Y. 2015).  Similarly, under New York law, "the publication of a fair and true report of any judicial proceeding" is privileged.  N.Y. Civ. Rights Law § 74 ("A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding."); *see also Kinsey v. New York Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021) (holding that newspaper's publication of an allegedly defamatory statement from a legal filing is privileged under New York's fair report privilege).  The statement here, however, was not made in litigation or as part of a report on a judicial proceeding; indeed, no litigation had yet commenced.  *See Reeves v. Am. Broad. Companies, Inc.*, 580 F. Supp. 84, 89 (S.D.N.Y.) ("The courts of New York have held that the statutory and common-law privileges attach only after the action is commenced . . . ."), *aff'd*, 719 F.2d 602 (2d

Cir. 1983); Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the

court."); *Rekor Sys., Inc. v. Loughlin*, No. 19-cv-7767 (S.D.N.Y. Aug. 19, 2019) (Complaint in

Rekor Action filed on August 19, 2019).  The 10-Q statement also is not shielded by the

qualified privilege that applies to "statements made by attorneys prior to the commencement of

litigation." *Front*, 28 N.E.3d at 16.  "The pre-litigation privilege is intended to protect attorneys

from defamation claims 'so that those discharging a public function may speak freely to

zealously represent their clients without fear of reprisal or financial hazard.'"  *Giuffre v.

Maxwell*, 2017 WL 1536009, at *8 (S.D.N.Y. Apr. 27, 2017) (quoting *Front*, 28 N.E.3d at 18).

This privilege, however, does not apply because the 10-Q statement was not made by an attorney

in the course of representing a client.  *See Giuffre*, 2017 WL 1536009, at *8 (finding that "the

pre-litigation privilege does not apply" because the statement "cannot be considered a statement

made by an attorney" (cleaned up)).

     The 10-Q statement also does not fall squarely into the absolute privilege the New York

Court of Appeals has recognized for statements made in the "preliminary or investigative stages

of [a judicial or quasi-judicial] process, particularly where compelling interests are at stake."

*Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 443 (N.Y. 2007).  Thus, for example, "[a]bsolute

immunity has been afforded to communications made in the course of such proceedings as the

filing of a claim before a Workmen's Compensation Board, the filing of a complaint before a

grievance committee of a Bar Association and the filing of a complaint before an agency

licensing real estate brokers in connection with a license revocation proceeding." *Toker*, 376

N.E.2d at 168 (citations omitted).  "In each of these proceedings, as well as others held to be

quasi-judicial, the administrative body exercised a quasi-judicial function.  A hearing was held at

which both parties were entitled to participate.  The administrative body was empowered, based

upon its findings, to take remedial action, whether it be an award of compensation, disbarment, or revocation of a license." *Id.* (citation omitted).  Moreover, "[t]he absolute protection afforded such individuals is designed to ensure that their own personal interests—especially fear of a civil action, whether successful or otherwise—do not have an adverse impact upon the discharge of their public function." *Stega v. New York Downtown Hosp.*, 107 N.E.3d 543, 549 (N.Y. 2018) (quoting *Toker*, 376 N.E.2d at 166).  Central to the notion of absolute privilege for statements made in a quasi-judicial proceeding is both that there is a public interest in the reporting of the statements to the administrative body and that "the process must make available a mechanism for the party alleging defamation to challenge the allegedly false and defamatory statements," thus "enabl[ing] the defamed party to contest what is said against her."  *Stega*, 107 N.E.3d at 550-51. The allegedly defamatory statement—if false—is essentially self-correcting by the very body to whom the statement is made which is charged with an investigation of the statement.

Thus, for example, in *Rosenberg*, 866 N.E.2d at 439, the New York Court of Appeals held that an absolute privilege applied to statements made by an employer about a terminated employee on a U-5 Form submitted to the National Association of Securities Dealers ("NASD"), which "[u]pon receipt of the Form U-5," "routinely investigates terminations for cause to determine whether the representative violated any securities rules," *id.* at 444.  "NASD's disciplinary hearings gave a terminated broker an opportunity to defend himself or herself against charges of misconduct 'before a NASD hearing panel.'"  *Stega*, 107 N.E.3d at 551 (quoting *Rosenberg*, 866 N.E.2d at 444).  Because "the compulsory Form U-5 can be viewed as a preliminary or first step in the NASD's quasi-judicial process," statements in the U-5 are accorded absolute privilege.  *Rosenberg*, 866 N.E.2d at 444.

Admittedly, there are similarities between the facts that supported the recognition of an absolute privilege in *Rosenberg* and those that are at issue here.  In both cases, there is a public interest that those who are charged with reporting—to the NASD and potential customers in *Rosenberg* and to the SEC and the investing public here—do so free from the concern that "their own personal interests—especially fear of a civil action, whether successful or otherwise—[would] have an adverse impact upon the discharge of their public function."  *Stega*, 107 N.E.3d at 549.  In both cases, the alleged falsity of the report is self-correcting.  The statement at issue here was made in the "Recent Developments" and "Commitments and Contingencies" sections of the Form 10-Q.  It reported on facts that went directly to the question of the amount of securities called for by warrants issued by the Company.  All concede that such reporting was required.  *See* 17 C.F.R. § 229.202(c) (public issuer required to report on the amount of securities called for by warrants, and the amount of warrants or rights outstanding, and any other material terms of such rights on warrants).  It plainly was material.[10]  The Company's decision also was not self-executing.  The warrants did not give the Company discretion whether to honor the warrants or not, *see* Dkt. Nos. 17-5, 17-6, 17-7, 17-8, 17-9, 17-10; for the Company's "position" to hold, Plaintiffs would either have had to accede to that position or lose in a litigation.  Thus, to the extent that the Company's position was established to be false, the statement would be self-correcting.  As all also concede, Rekor would have to report not just the cloud that currently is on the exercise of the warrants by virtue of the Company's position but any lifting of that cloud as a result of negotiation between the parties or the outcome of this litigation.[11]

---

[10] At oral argument, Plaintiffs' counsel indicated that Plaintiffs collectively had warrants to purchase about 600,000 shares of stock.  Hr'g Tr. 27:16-20.

[11] Indeed, the Company has reported developments in the Rekor Action in its subsequent Form 10-K and Form 10-Q filings.  *See* Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 31, 39 (Nov. 14, 2019); Rekor Sys., Inc., Annual Report (Form 10-K), at 4, 15, 46 (Mar. 30, 2020);

In the end, however, the New York Court of Appeals likely would conclude that the 10-Q statement is not protected by the absolute privilege for statements made during the preliminary or investigative stages of a judicial or quasi-judicial proceeding because they were not made to the SEC as part of a quasi-judicial proceeding. *See Stega*, 107 N.E.3d at 546-48, 551-52 (holding that absolute privilege did not apply to comments made by a doctor about a colleague as part of a Food and Drug Administration investigation where the colleague was not entitled to participate in the review or challenge the accusations). Although the 10-Q filing is mandatory, it not a preliminary or first step in an SEC quasi-judicial process, pursuant to which the SEC will adjudicate the truth or falsity of the statement. The function of SEC reporting is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor," *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963), to permit investors to make informed decisions regarding whether to purchase or sell securities. A Form 10-Q, like a Form 10-K, is a disclosure that is required to inform primarily *investors*, and not primarily the SEC, of a "company's financial position during the year and generally includes unaudited financial statements." *Fischkoff*, 339 F. Supp. 3d at 386 (quoting *Wyche v. Adv. Drainage Sys., Inc.*, 2017 WL 971805, at *1 n.1 (S.D.N.Y. Mar. 10, 2017), *aff'd,* 710 F. App'x 471 (2d Cir. 2017)). It is not made "to alert the [SEC] to potential misconduct and, in turn, [to] enable the [SEC] to investigate, sanction and deter misconduct," and so it is not part of quasi-judicial process. *Rosenberg*, 866 N.E.2d at 500. The 10-Q statement thus is not protected by the absolute privilege for statements made in a judicial or quasi-judicial setting. *See Fischkoff*, 339 F. Supp.

---

Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 23, 46 (May 13, 2020); Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 25-26, 48 (Aug. 3, 2020); Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 26, 48 (Nov. 9, 2020); Rekor Sys., Inc., Annual Report (Form 10-K), at 30, 81 (Mar. 12, 2021); Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 25, 46 (May 10, 2021); Rekor Sys., Inc., Quarterly Report (Form 10-Q), at 22-23, 42 (Aug. 16, 2021).

3d at 390 (similarly concluding that absolute privilege is not available for statements contained within an SEC 10-Q filing).

The Court concludes that the New York Court of Appeals would conclude that the 10-Q statement at least is subject to a qualified privilege. Two state courts applying non-New York law have held that allegedly defamatory statements contained within SEC filings are protected by qualified privilege. *See Hampshire Grp., Ltd. V. Kuttner*, 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010) (finding that, under South Carolina law, statements contained within SEC filings were shielded by qualified privilege based common interest and legal duty); *Abella v. Barringer Res., Inc.*, 615 A.2d 288, 293 (N.J.Super.Ch. 1992) (finding that allegedly defamatory statements in SEC Form 10-K were protected by qualified privilege as furthering a legitimate public interest). No state court has found that such filings are entitled to lesser protection.

In New York, "[a] statement is generally 'subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral.'" *Chandok*, 632 F.3d at 814 (quoting *Rosenberg*, 866 N.E.2d at 442); *see also, e.g.*, *Stukuls v. State*, 366 N.E.2d 829, 833 (N.Y. 1977) (finding a qualified privilege applies "though the duty be not a legal one, but only a moral or social duty of imperfect obligation"). Relatedly, "a 'qualified[ ] privilege extends to a communication made by one person to another upon a subject in which both have an interest.'" *Chandok*, 632 F.3d at 815 (quoting *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992)). "This privilege encompasses a defamatory communication on 'any subject matter in which the party communicating has an interest . . . made to a person having a corresponding interest.'" *Id*. (quoting *Stukuls*, 366 N.E.2d at 833). "Courts recognize a common interest privilege in instances where 'the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may

31

be done to the reputation of others.'"  *Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010) (quoting *Garson v. Hendlin*, 532 N.Y.S.2d 776, 780 (N.Y. App. Div. 1988)).  Thus, "[a]s long as the privilege is not abused, the exchange of information between parties who maintain a common interest should not be disrupted."  *Id*.  "In some instances the common-interest privilege may overlap the moral-duty privilege, for one may have a moral duty to communicate . . . knowledge and information about a person in whom the [speaker] ha[s] an interest to another who also has an interest in such person."  *Chandok*, 632 F.3d at 815 (internal quotation marks and citation omitted; alteration in original); *see also Stukuls*, 366 N.E.2d at 833 (explaining that "[t]he rule of law that permits such publications [covered by the moral or legal duty privilege] grew out of the desirability in the public interest of encouraging a full and fair statement by persons having a legal or moral duty to communicate their knowledge and information about a person in whom they have an interest to another who also has an interest in such person").

The qualified privilege concerning common interest and legal duty applies to the 10-Q statement.  Rekor and members of its board and investors in Rekor securities all shared a common interest in knowing both the number of shares of common stock that were outstanding and also the number of shares that could be obtained through the exercise of warrants or options. It was material to whether the Plaintiffs' warrants could be converted into common stock.  As the SEC itself has recognized, all shareholders have an interest in "(1) [t]he amount of securities called for by such warrants or rights; (2) [t]he period during which and the price at which the warrants or rights are exercisable; (3) [t]he amount of warrants or rights outstanding; (4) [p]rovisions for changes to or adjustments in the exercise price; and (5) [a]ny other material terms of such rights on warrants."  17 C.F.R. § 229.202(c).  This regulation reflects the commonsense observation that the number of warrants outstanding and whether and how they

can be converted to common stock are important to the value of Rekor common stock and thus to the company as well as investors and shareholders: the more shares that can be obtained by warrant the lesser the value of any outstanding share of common stock. Thus, each shareholder shared a common interest with Rekor and its board in knowing both the position that the Company intended to take with respect to any attempted exercise of the warrants by Plaintiffs and the basis for that position. Only by understanding the position and the basis could a shareholder understand what the Company was going to do and whether its position was likely to prevail.

Plaintiffs do not dispute that Rekor had to report the position it intended to take with respect to the warrants. The warrants on their face gave Plaintiffs the right to obtain hundreds of thousands of shares of Rekor common stock. It would have been misleading to report that Rekor had outstanding warrants for hundreds of thousands of shares without also disclosing that, if Rekor had its way, those warrants would never be converted into the shares. Rekor had to say something; shareholders were entitled to know both the position and the basis for the position. It cannot be that the very statement that the company is required to make to avoid securities law liability and to discharge its duties to its investors it is prohibited from making to satisfy its obligations to the officers. That view would create the very chilling effect with respect to the reporting of matters of public and common interest that the law of privilege is intended to avoid. *See Stega*, 107 N.E.3d at 552 ("[A] qualified privilege does provide an atmosphere in which a civic-minded citizen may, without fear, convey information . . . to the benefit of the public." (quoting *Toker*, 376 N.E.2d at 168)); *Liberman*, 605 N.E.2d at 349 ("The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded."). If it turns out

that the Company's position is wrong or ill-founded, moreover, it will self-correct.  The

Company did not have the unilateral right not to honor the warrants; it could unilaterally only

take a position.  *See* Dkt. No. 17-5 ¶ 2(b) (stating that upon exercise of the warrant, the warrant

holder shall be deemed to have become the holder of warrant stock); Dkt. No. 17-6 ¶ 2(b)

(same); Dkt. No. 17-7 ¶ 2(b) (same); Dkt. No. 17-8 ¶ 2(b) (same); Dkt. No. 17-9 ¶ 2(b) (same);

Dkt. No. 17-10 ¶ 2(b) (same).  If that position does not prevail, if the Company is forced to honor

the warrants, that fact too will be disclosed—the next time Rekor is forced to disclose the

warrants outstanding.  In both events, the interests of the shareholders will be served.

The fact that a qualified privilege applies does not automatically grant Defendant

impunity, but Plaintiffs have not alleged facts to overcome the qualified privilege.  Under New

York law, "[a] qualified privilege may be overcome by a showing of either 'actual' malice (*i.e.*,

knowledge of the statement's falsity or reckless disregard as to whether it was false) or of

common-law malice."  *Chandok*, 632 F.3d at 815.  But "[m]ere conclusory allegations, or

charges based upon surmise, conjecture, and suspicion are insufficient to defeat the qualified

privilege."  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009)

(quoting *Golden v. Stiso*, 720 N.Y.S.2d 164, 165 (N.Y. App. Div. 2001)).  The burden of this

showing is on the plaintiffs.  *See Boehner*, 734 F. Supp. 2d at 401.

Plaintiffs argue that they have alleged that the statement was made with actual malice as

part of the alleged retaliation campaign.  Dkt. No. 16, Opp., at 12 (citing Am. Compl. ¶ 83).

Actual malice refers to knowledge that a statement is false or reckless disregard of its truth or

falsity; it is not the same thing as "not knowing whether something is true."  *Liberman*, 605

N.E.2d at 350; *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  The facts

alleged by Plaintiffs show at most that Goord had a motive to defame the Plaintiffs.  Allegedly,

they (or at least Rhulen) had taken a position adverse to Goord's friend and colleague Berman when Rhulen made a whistleblower complaint against Berman.  But there is a difference between a motive to defame and knowledge that a defamatory statement is false.  *See Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.").  Corporations, like any organization, are rife with individuals with competing motives and individual likes and dislikes and vendettas.  The Court accepts, as it must at this stage of the litigation, that Goord had a motive to defame Plaintiffs.  The facts alleged do not support the conclusion that Goord knew or recklessly failed to know that the statement was false at the time it was made.  There is no allegation made to that effect.

Plaintiffs' allegations of common-law malice are also insufficient to overcome the qualified privilege.  "Common-law malice means spite or ill will, and will defeat the privilege only if it is the one and only cause for the publication." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000) (cleaned up and citations omitted).  As discussed, Plaintiffs argue that the statement was made as part of Berman's retaliation campaign.  But the statement here also provided the basis upon which the Company thought the warrants were subject to rescission, a topic of critical importance to shareholders as to which Rekor had a duty to report.  Thus, even if Goord harbored personal animosity against Plaintiffs as part of Berman's retaliation campaign, this ill will was not the "one and only" reason for the statement's publication and thus cannot overcome the qualified privilege.

Because the 10-Q statement is protected by a qualified privilege, Plaintiffs' libel claim fails to state a claim upon which relief can be granted.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 6 and 11.  Because Plaintiffs already had the opportunity to amend their complaint after Defendant's first motion to dismiss and because Plaintiffs identify no facts that could cure the defects in their pleading, dismissal with prejudice is appropriate.  *See, e.g.*, *Treppel v. Biovail Corp.*, 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless.").  The Clerk of Court is respectfully directed to close the case.


SO ORDERED.


Dated: September 1, 2021
      New York, New York
                                        LEWIS J. LIMAN
                             United States District Judge